UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ASHLEY BLANKENSHIP,
Administratrix of the
Estate of AUBREE INGERSOLL,
a deceased infant,

       Plaintiffs,

v.                                    Civil Action No. 2:16-cv-12082

NECCO, LLC,
successor-in-interest to
NECCO, INC., and d/b/a NECCO
d/b/a NECCO & ASSOCIATES,
and NECCO, INC.,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is plaintiffs' motion for summary judgment, filed December 6, 2017. Also pending is defendants' motion for summary judgment, filed December 8, 2017.

I.    Factual and Procedural Background

This case arises out of the death of a fifty-two-day-old infant, Aubree Ingersoll, that occurred while the child was under the care of the West Virginia Department of Health and Human Resources ("WV DHHR") in the home of certified foster parents. <u>See</u> Transfer of Custody Ex. A Def.'s Mot. Summ. J. ("Defs.' Mot"); Walls Certificate of Recertification Ex. E

Defs.' Mot.; Report of Criminal Investigation ("Investigation Report") Ex. D Pls.' Mot. Summ. J. at 2[1] ("Pls.' Mot."); Report of Death Ex. F Pls.' Mot. at 6.  Aubree was born on May 11, 2015 and taken into custody by WV DHHR the next day before leaving the hospital.  Transfer of Custody; Amy Rickman Aff. Ex. B Defs.' Mot. at 6.  WV DHHR contracts with defendant Necco, LLC successor-in-interest to Necco, Inc. and doing business as Necco and Necco and Associates (together "Necco") "for the provision of specialized foster care services for youth in the custody/guardianship of the [WV DHHR]."  2015 Contract at 1 Ex. A Pls.' Mot.; see 2013 Contract at 1 Ex. 1 to Ex. B, Ex. H Defs.' Mot.

Through Necco, Aubree was placed with foster parents Aaron David Hall and Stella June Hall, who were certified by Necco as therapeutic foster parents.  Rickman Aff. at 6; Hall Certificate Ex. C Def.'s Mot.  On or around June 24, 2015, Aubree was transferred, with approval from WV DHHR and Necco, for approximately twelve days of respite foster care to the home of Steven and Charity Walls, who were similarly certified Necco foster parents.  Rickman Aff. at 6; Request for Youth Ex. D Defs.' Mot.; Walls Certificate; Walls Foster Agency Agreement

---

[1] All references to this document utilize the pagination generated by ECF.

Ex. B Pls.' Mot.  Defendants represent that "[r]espite care is the planned or emergency temporary relief of caregivers of a foster child.  In this instance, certified Necco foster parents Steven and Charity Walls provided respite care to Aubree while David and Stella Hall were on vacation."  Defs.' Mem. Supp. Summ. J. 3 n. 4 ("Defs.' Mem.").  Mr. and Ms. Walls raised a daughter of their own, age six at the time of these events, and had previously provided foster care for approximately six children, at least two of whom were infants under one year in age.[2]  Charity Walls Dep. 18 Ex. E Pls.' Mot.; see Steven Walls Dep. 6, 25-27 Ex. L Pls.' Mot.

At approximately 1:30 or 2:00 a.m. on July 1, 2015, Aubree woke up and was fed by Ms. Walls, who then burped her, swaddled her, and placed her back in the crib that was beside Ms. Walls' bed.  Investigation Report at 2; Report of Death at 6.  Ms. Walls placed Aubree turned onto her side and also placed a rolled up blanket in the crib as a positioner to support Aubree and prevent her from rolling onto her stomach.  Walls

---

[2] Ms. Walls testified that one of the six other foster placements was a short-term respite placement, but she gives some indication that the other placements were typical, non-respite foster placements.  C. Walls Dep. 18.  Mr. Walls testified that the Walls family was interested in trying to adopt one of the female children that had been placed for foster care in the home.  S. Walls Dep. 25-26.  This foster child was also in the home at the time that the Walls family took Aubree for respite care.  S. Walls Dep. 30.

Dep. 23; Report of Death at 6. Ms. Walls testified that on the night of the incident, Aubree "didn't burp well -- only a small burp," and that Aubree had "spit up a little bit in the days prior." She adds, "[s]o I wrapped her back. I laid her down on her back just kind of to her side, just slightly enough that if she would spit up, she wouldn't choke was my intention." C. Walls Dep. 21.

At 6:00 a.m., Ms. Walls awoke to her alarm, proceeded to check on Aubree, and found the infant was cold and unresponsive. Report of Death at 6; Investigation of Alleged Abuse or Neglect in Child Care Agency ("Neglect Investigation") at 1 Ex. F Defs.' Mot. Ms. Walls noted that Aubree's head was now turned toward the blanket, but she maintained that "her face was visible. You could clearly see all of her face." Compare Neglect Investigation at 1; Report of Death at 6 ("decedent's face and body were pressed against the blanket roll") with C. Walls Dep. 24. Ms. Walls called 911 and proceeded to perform cardiopulmonary resuscitation with some additional instruction by the 911 dispatcher. Report of Death at 6; Investigation Report at 2; Neglect Investigation at 1. Medics arrived at the home at 6:23 a.m. and pronounced Aubree dead at the scene at 6:33 a.m. Report of Death at 1, 6.

A post-mortem examination and death investigation was performed on Aubree on July 2, 2015. Id. at 1. As a result of this examination, Dr. Joseph DelTondo, Deputy Chief Medical Examiner, found that Aubree "died as a result of Sudden Unexplained Infant Death" ("SUID"). Id. at 6. He further stated that "[s]ide sleeping with rolled blankets and/or other items in a crib is considered unsafe sleep conditions, and is listed as factors contributing to death," but noted "[t]he manner of death for the purposes of vital statistics registration is undetermined." Id. In its investigation of the incident, WV DHHR determined that "child neglect ha[d] not occurred." Neglect Investigation at 1. No criminal charges were filed, and WV DHHR took "[n]o actions (e.g., no citations, sanctions, or limitations placed on Necco's license)." Rickman Aff. at 6-7.

Plaintiff Ashley Blankenship, the biological mother of Aubree, brought this action on December 13, 2016 against former defendant ENA, Inc. See Compl. On April 20, 2017, plaintiffs filed their amended complaint, removing any claim against ENA, Inc. and instead bringing suit against Necco. Am. Compl. Plaintiffs allege four counts against Necco: (1) vicarious

liability based on the negligence of the foster parents, (2) negligence of Necco, (3) res ipsa loquitur, and (4) punitive damages. See Am. Compl. ¶¶ 15-32.

Both plaintiffs and defendants seek summary judgment on the issue of vicarious liability. Specifically, the plaintiffs request that the court find that "(I) Charity Walls was negligent which proximately caused or contributed to Aubree Ingersoll's death; (II) Charity Walls was acting within the scope of her authority or employment as a foster parent at all times relevant to Aubree Ingersoll's death; and (III) defendant, Necco, is vicariously liable for Charity Walls'[] negligence." Pls.' Mot. 6. In addition to the issue of vicarious liability, Necco also asks that the court grant it summary judgment on the remaining three counts. Necco asserts that summary judgment for it on all the claims brought against it is proper because (1) Necco is immune from civil liability pursuant to W. Va. Code § 49-2-810, and its foster parents act in loco parentis and should be protected by parental immunity; (2) because foster parents, such as Mr. and Ms. Walls, are not employees, agents, or servants of Necco, the foster agency cannot be held vicariously liable; (3) that Necco was not negligent as it operated in conformance with industry best practices at all times relevant to Aubree's death; (4) that Aubree's death was unexplained and

accidental, so res ipsa loquitur cannot apply to prove negligence; and (5) if summary judgment is granted as to the preceding issues, punitive damages may not proceed as a standalone claim. Defs.' Mot. 2; Defs.' Mem. 15-17.

## II. Governing Standard

When both parties have filed motions for summary judgment, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 637-38 (4th Cir. 2007) (quoting Rossignol v. Voorhaar, 316 F.3d 348, 354 (4th Cir. 2003)). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (same). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

### III.  Discussion

#### 1. Immunity

As a preliminary matter, Necco asserts that it is entirely immune from suit on this incident pursuant to W. Va. Code § 49-2-810.  Defs.' Mot. 2; Defs.' Mem 15-17.  Necco further asserts that foster parents Steven and Charity Walls are covered by the traditional doctrine of parental immunity, such that they have no liability to import to Necco.  Id.  Each basis for immunity will be discussed in turn.

#### A. Statutory Immunity

W. Va. Code § 49-2-810 prescribes that "[a]ny person, official or institution participating in good faith in any act permitted or required by this article are immune from any civil or criminal liability that otherwise might result by reason of those actions."  This immunity provision appears in Article 2 of Chapter 49 of the West Virginia Code, which governs state responsibilities for children.  See W. Va. Code § 49-2-101 et seq.  Necco asserts that "the evidence of record demonstrates that at all times relevant to this action, Necco was participating in acts permitted and/or required under" Chapter

49, Article 2 of the West Virginia Code, the relevant "article" for which immunity is granted by § 49-2-810.  Defs.' Mem. 11. Therefore, Necco argues, it should be immune from suit for this incident because statutory immunity is provided to "any act permitted or required by this article."  W. Va. Code § 49-2-810.

In 2015, the State Legislature undertook to recodify Chapter 49 of the West Virginia Code in order to "embrace in a revised, consolidated, and codified form and arrangement the laws of the State of West Virginia relating to child welfare." W. Va. Code § 49-1-101.  Prior to this recodification, the immunity provision relied upon by defendants was located at Article 6A of Chapter 49, which was solely concerned with the mandatory reporting for children suspected to be suffering abuse.  See W. Va. Code § 49-6A-1 et seq. (2014).  Therefore, up and until the time of the 2015 recodification, which became effective on May 17, 2015, the statutory immunity appears to have been available only for acts taken in good faith under Article 6A.  W. Va. Code § 49-6A-6 (2014).

At the time of the recodification, the legislature stated the following intent:

> In recodifying the child welfare law of this state during the regular session of the Legislature in the year 2015, it is intended by the Legislature that each specific reenactment of a substantively similar prior statutory provision will be construed as continuing

> the intended meaning of the corresponding prior
> statutory provision and any existing judicial
> interpretation of the prior statutory provision.  It
> is not the intent of the Legislature, by recodifying
> the child welfare law of this state during the regular
> session of the Legislature in the year 2015 to alter
> the substantive law of this state as it relates to
> child welfare.

W. Va. Code § 49-1-102.  This statement tends to indicate

that the legislature did not wish to create a broad

statutory immunity for any action taken in good faith under

Article 2, as Necco entreats.  Rather, it appears that this

immunity should continue to extend only to actions related

to mandatory reporting requirements for children suspected

to be victims of child abuse -- that is, it should apply

only to Part VIII of Article 2.

As Necco has made no assertion that any of its

actions or the actions of its foster parents were permitted

or required by Part VIII of W. Va. Code § 49-2, it is not

immune from suit in this action.

### B. Parental Immunity

"[T]he doctrine of parental immunity prohibits a child

from bringing a civil action against his or her parents." <u>Cole

v. Fairchild</u>, 198 W. Va. 736, 482 S.E.2d 913, 926 (W. Va. 1996)

(citing <u>Lee v. Comer</u>, 159 W. Va. 585, 224 S.E.2d 721, 722 (W.

Va. 1976)).  The Supreme Court of Appeals of West Virginia has

stated both that "the underlying purpose of this doctrine is to preserve the peace and tranquility of society and families by prohibiting such intra-family legal battles," and that "the real purpose behind the doctrine is simply to avoid undue judicial interference with parental discretion," which "entails countless matters of personal, private choice," and "[i]n the absence of culpability beyond ordinary negligence, those choices are not subject to review in court." Cole 482 S.E.2d at 926 (quoting Shoemake v. Foegel, LTD, 826 S.W.2d 933, 936 (Tex. 1992) (internal quotations omitted).

Several exceptions to the doctrine have been carved out of the general immunity. See Cole 482 S.E.2d at 926. One exception allows a child to bring suit against a parent for personal injuries sustained in an automobile accident caused by his or her parent's negligence. Syl. pt. 2, Lee 224 S.E.2d 721. This exception exists for automobile accidents because "in most instances, there was automobile liability insurance coverage," so "there would be no real disruption of family harmony." Courtney v. Courtney, 186 W. Va. 597, 413 S.E.2d 418, 427 (W. Va. 1991). A child may also bring suit against a parent for injury or death caused by "intentional or willful conduct." Syl. pt. 9, Courtney 413 S.E.2d 418. Further, "[t]he parental immunity doctrine does not prohibit the negligence of a parent

from being asserted as a defense in an action brought by the parent for the wrongful death of a child."  Syl. pt. 7, <u>Cole</u> 482 S.E.2d 913.

Necco asserts that foster parents should be entitled to parental immunity because they act in loco parentis, that is, they "act[] as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent." Black's Law Dictionary 858 (9th ed. 2009); Defs.' Mem. 15-17. Nevertheless, Necco acknowledges that the issue of whether a foster parent is entitled to parental immunity has never been explicitly addressed or adopted by the Supreme Court of Appeals of West Virginia.  Defs.' Mem. 16.  There is some support for a foster parent being treated as acting in loco parentis under West Virginia law, as in <u>Clifford K. v. Paul S. ex rel. Z.B.S.</u> the Supreme Court of Appeals held that a "psychological parent" could include foster parents, and noted that a "psychological parent" is similar to the "concepts of 'de facto parent' status or 'in loco parentis.'"  217 W. Va. 625, 619 S.E.2d 138, 157 n. 19 (W. Va. 2005).

While the Supreme Court of Appeals for West Virginia has never explicitly extended the doctrine of parental immunity to foster parents, there are policy indications as to why it should not apply in a case such as this.  The two traditional

policies underlying the justification for parental immunity are preserving the peace of society by avoiding intra-family legal battles and avoiding undue judicial interference with parental discretion. _Cole_ 482 S.E.2d at 926. As to the first policy, the court notes that because Aubree is now deceased, and no foster parent is named as a defendant in this action, the potential for intra-family discord does not exist. As the Supreme Court noted in _Cole_, "the espoused purpose of the doctrine of parental immunity is less forceful when a child dies and a wrongful death suit is brought. As a result of the child's death, the potential conflict between the child and the parent no longer exists." _Id._ at 927.

Similarly, less discretion is given to foster parents in caring for children placed in their homes when compared to natural parents. Foster parents and foster agencies are governed by numerous statutory and regulatory requirements to provide for the safety and well-being of foster children. _See generally_ W. Va. Code §§ 49-2-107, 49-2-126; W. Va. Code R. §§ 78-2-1 _et_ _seq._

Among other requirements, foster parents must have "the life experiences, personal characteristics and temperament suitable for working with children in need of care." W. Va. Code R. § 78-2-13. In order to be approved, prospective foster

parents must submit to background checks and provide a minimum of four non-relative references.  Id.  Foster parents may not have more than six children in their home and will not be permitted to parent two children less than two-years-old at the same time.  Id.  A foster home cannot, absent special approval, have any resident who has any convictions other than minor traffic violations.  Id.  Foster parents must provide proof of reliable transportation and sufficient income.  Id.  They must submit to a comprehensive home study.  W. Va. Code R. § 78-2-16. If both parents work, they must receive approval of their plan for the care of the children during work hours.  Id.  They must participate in a required orientation and training curriculum both before a child is placed in their home and on an ongoing basis.  Id. at § 78-2-20.

As it relates to this case especially, the record indicates that Ms. Walls may have received at least some instruction on best practices for placing children to sleep in cribs -- including not placing any soft blankets, stuffed animals, or other loose bedding in the crib with a sleeping child.  See C. Walls Dep. 12-13; S. Walls Dep. 28-29; Rickman Aff. at 5.  Because of the special requirements and regulations placed on foster parents, as well as their increased oversight and training, they have less discretion in determining how to

best care for children placed in their home.  As a consequence,
any judicial review for acts of alleged negligence is more
suitable in the case of a foster parent.

The court concludes that Steven and Charity Walls as
foster parents are not covered by parental immunity.

### 2. Vicarious Liability

Both plaintiffs and defendants seek summary judgment
as it relates to Count I of the amended complaint, alleging
Necco's vicarious liability for the actions of Ms. Walls.  The
parties both request that the court determine whether Ms. Walls
was an employee, agent, or servant of Necco, such that Necco
could be held vicariously liable.  The plaintiffs further
request that the court rule as a matter of law that Ms. Walls
was negligent in her actions that allegedly resulted in Aubree's
death.

"Where a defendant has control over the negligent
actor, he may be vicariously liable for that actor's
negligence."  Thomas v. Raleigh Gen. Hosp., 178 W. Va. 138, 358
S.E.2d 222, 224 (W. Va. 1987).  An employer may be vicariously
liable for the acts of an employee under the theory of
respondeat superior, as "[t]he master is answerable to a

stranger for the negligent act of a person employed by the
[master or] master's authorized agent, if the act is within the
scope of the person's employment." Zirkle v. Winkler, 214 W.
Va. 19, 585 S.E.2d 19, 22 (W. Va. 2003) (quoting Syl. pts. 3-4,
O'Dell v. Universal Credit Co., 118 W. Va. 678, 191 S.E. 568 (W.
Va. 1937)).  However, a defendant generally cannot be held
vicariously liable for negligent actions committed by its
independent contractor.  Syl. pt. 5, Law v. Phillips, 136 W. Va.
761, 68 S.E.2d 452 (W. Va. 1952).

        In analyzing whether a master-servant, principal-
agent, or employer-employee relationship exists in order to
impute liability, there are four general factors the court may
consider: "(1) Selection and engagement of the servant; (2)
Payment of compensation; (3) Power of dismissal; and (4) Power
of control. The first three factors are not essential to the
existence of the relationship; the fourth, the power of control,
is determinative."  Syl. pt. 5, Paxton v. Crabtree, 184 W. Va.
237, 400 S.E.2d 245 (W. Va. 1990).  Stated another way: "The
test of the relation between one having work done and the
workman consists in the employer's right or lack of right to
supervise the work.  If that right exists, the relation is that
of master and servant.  If that right does not exist, the

relation is that of employer and independent contractor." Syl. pt. 1, <u>McCoy v. Cohen</u>, 149 W. Va. 197, 140 S.E.2d 427 (W. Va. 1965). Under West Virginia law,

> It is always incumbent upon one who asserts vicarious liability to make a prima facie showing of the existence of the relation of master and servant or principal and agent or employer and employee. However, once a prima facie showing has been made, it is incumbent upon one who would defeat liability on the basis of an independent contractor relationship to show such fact. If there is a conflict in the evidence, and there is sufficient evidence to support a finding of the jury, the determination of whether one is an independent contractor is a question for the jury.

<u>Sanders v. Georgia-Pacific Corp.</u>, 159 W. Va. 621, 225 S.E.2d 218, 222 (W. Va. 1976) (internal citations omitted).

Necco argues that plaintiffs have not made a prima facie showing that foster parents are its agents, servants, or employees. In fact, Necco states its belief that "the role of a foster parent[] is unique and should not be shoehorned into the box of employer-employee or independent contractor status." Defs.' Mem. 21. Rather, foster parents "may best be described as expense-reimbursed volunteers who assist the State in caring for children in its custody." Defs.' Mot. 2-3; see <u>Mitzner ex rel. Bishop v. Kansas Dep't of Social & Rehabilitation Servs.</u>, 891 P.2d 435 (Kan. 1995) ("A more apt description of a foster parent would be more of an expense-reimbursed volunteer who must be licensed and who operates within certain guidelines.").

However, Necco contends that even if foster parents are considered to be independent contractors of the foster agency, Necco does not exercise control sufficient to impart vicarious liability for the acts or omissions of a foster parent. Necco maintains that its "relationship with its foster parents, including Mrs. Walls, is prescribed by its contract with [WV] DHHR and by a comprehensive set of regulations by which it must abide." Defs.' Resp. Pls. Mot. 12.

"It is the responsibility of the [WV DHHR] to provide care for neglected children who are committed to its care for custody or guardianship. The [WV DHHR] may provide this care for children in family homes meeting required standards of certification established and enforced by the [WV DHHR]." W. Va. Code § 49-2-106. Pursuant to W. Va. Code § 49-1-206, Necco is a licensed "Child Placing Agency," which is defined as, "a child welfare agency organized for the purpose of placing children in private family homes for foster care or for adoption. The function of a child placing agency may include the investigation and certification of foster family homes and foster family group homes as provided in this chapter." See also Child Placing Licenses Ex. M Defs.' Mot.

Necco recruited, trained, and certified prospective foster parents to house and care for children in the custody of the WV DHHR. Crawford Dep. Ex. H Pls.' Mot. 11-19; Adams Dep. Ex. K Defs.' Mot. 18-24. Foster parents are provided with a per diem as reimbursement for the expenses of having an additional child in their home. Davis Dep. Ex. I Pls.' Mot. 37; 2013 Contract 9. Necco foster parents enter into an agreement with Necco that outlines the extensive responsibilities to be performed by foster parents including: treating foster children as family members; providing varied and nutritious food; assisting with schoolwork; providing opportunities for children to participate in recreational activities; promoting and encouraging hygiene; providing non-medical transportation; providing opportunities and encouragement for religious training; participating in assessments, case planning conferences, transition planning, and ongoing family support groups; documenting foster children's behaviors; immediately reporting to Necco any accident or illness involving a foster child; notifying Necco when a child will be absent from a home overnight or before transporting a foster child out of state; reporting any suspicions of abuse or neglect; maintaining a working telephone; and employing supportive discipline while refraining from using corporal punishment. <u>See</u> Walls Foster Agency Agreement 1-4.

A foster parent who does not comply with the requirements set forth in the agreement and the parent handbook may be disciplined by Necco up to and including the closure of their home from providing foster services with Necco. Crawford Dep. 26-28, 32-34 ("The child placement agency can remove the child if the parents are not following the rules and regulations or they can remove the child for any reason they so choose."); Davis Dep. 32-34. Rebecca Adams, Home Resource Coordinator for Necco, testified:

> Q. What happens if they don't [follow the requirements]?
> A. A number of things could happen. They could receive a warning -- a verbal warning, a written warning. It could go as far as what we call a corrective action plan. Then it could also result in their home not being certified anymore.
> Q. So if they don't follow Necco's policies and procedures and rules, ultimately their home could be closed?
> A. Yes.
> Q. And they would no longer be able to serve as a Necco foster parent?
> A. Yes.
> . . . .
> [Discussing the Walls Foster Agency Agreement]
> Q. And did Necco come up with these [responsibilities]?
> A. The requirements that we have for foster parents basically are given to us by the state and we follow through with those.
> Q. You follow through with them. This agreement though is between Charity and Steven Walls and Necco, correct?
> A. Yes.
> Q. This is not with the state?
> A. Correct.

```
Q. So Necco requires them to provide these [twenty]
   things to foster children?
A. Yes.  We require exactly what the state would
   require.
. . . .
Q. And all of these [responsibilities] are required?
   They're not negotiable?  These have to be followed?
A. They are required.
Q. And what happens if any of these aren't followed
. . . .
A. Like I said earlier, they could be subject to a
   warning -- verbal warning, written warning.  There
   could be a corrective action plan, and then closure
   of the home.
```

Adams Dep. 30-31, 36-41.


While it appears that Necco is given some discretion
in the performance of its duties as a Child Placing Agency, the
ultimate engagement, payment, dismissal, and control of foster
parents comes not from Necco, but from the WV DHHR as well as
the regulations imposed by the state of West Virginia.
Recognizing that "child welfare services should be directed by
the principle that the health and safety of children should be
of paramount concern," the West Virginia Legislature promulgated
a list of eleven goals for foster children in the care of the WV
DHHR:

```
(1) Protection by a family of his or her own, and be
    provided readily available services and support
    through care of an adoptive family or by plan, a
    continuing foster family;
(2) Nurturing by foster parents who have been selected
    to meet his or her individual needs, and who are
    provided services and support, including
    specialized education, so that the child can grow
    to reach his or her potential;
```

(3) A safe foster home free of violence, abuse, neglect and danger;

(4) The ability to communicate with the assigned social worker or case worker overseeing the child's case and have calls made to the social worker or case worker returned within a reasonable period of time;

(5) Permission to remain enrolled in the school the child attended before being placed in foster care, if at all possible;

(6) Participation in school extracurricular activities, community events, and religious practices;

(7) Communication with the biological parents. Communication is necessary if the child placed in foster care receives any immunizations and if any additional immunizations are needed, if the child will be transitioning back into a home with his or her biological parents;

(8) A bank or savings account established in accordance with state laws and federal regulations;

(9) Identification and other permanent documents, including a birth certificate, social security card and health records by the age of sixteen, to the extent allowed by federal and state law;

(10) The use of appropriate communication measures to maintain contact with siblings if the child placed in foster care is separated from his or her siblings; and

(11) Meaningful participation in a transition plan for those phasing out of foster care.

W. Va. Code § 49-2-126(a)(1)-(11). Additionally, there are numerous regulations for Child Placing Agencies that govern, inter alia, foster parent characteristics, comprehensive home study criteria, training requirements for foster parents, approval or denial of foster homes, evaluations of approved foster parents, and procedures for removing children from a home and closing the home to further foster placements. See W. Va. Code R. § 78-2-1 et seq.

Although some control may be exerted by Necco in carrying out the requirements which ultimately stem from the authority of the WV DHHR and the applicable regulations, this is not enough to create an agency relationship between Necco and its foster parents. The law in West Virginia confirms that

> An owner who engages an independent contractor to perform a job for him or her may retain broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract -- including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work -- without changing the relationship from that of owner and independent contractor, or changing the duties arising from that relationship.

Syl. pt. 4, <u>Shaffer v. Acme Limestone Co. Inc.</u>, 206 W. Va. 333, 524 S.E.2d 688 (W. Va. 1999).

Necco does not exert sufficient control over the actions of foster parents to create a master-servant or principal-agent relationship, and so, as a matter of law, Necco cannot be held vicariously liable for the alleged negligence of Ms. Walls in Aubree's death. Therefore, plaintiffs' request for summary judgment is denied and defendants' request is granted.

### 3. Negligence of Necco

Count II of the amended complaint alleges that Necco negligently caused Aubree's death by failing to:

a. reasonably and/or properly assess the ability of [the Hall and Walls families] to provide care, support and supervision for Aubree Ingersoll, a deceased infant;

b. properly study and assess foster parents' homes for the supervision and care of Aubree Ingersoll, a deceased infant;

c. provide reasonable and proper training to [the Hall and Walls families] for the care, supervision and needs of Aubree Ingersoll, a deceased infant;

d. create and maintain proper documentation relevant to foster care and related services provided to Aubree Ingersoll, a deceased infant;

e. provide supportive services to [the Hall and Walls families] and their households for Aubree Ingersoll, a deceased infant;

f. provide for the care, support and personal needs of Aubree Ingersoll, a deceased infant;

g. provide the care, support and services to Aubree Ingersoll, a deceased infant, required or otherwise mandated by West Virginia law; and

h. oversee and administer the transfer of Aubree Ingersoll, a deceased infant's, possession, custody, control, supervision and/or care from [the Hall family] to [the Walls family].

Am. Compl. ¶ 24. Necco asserts that there is no evidence in the record that it breached any applicable standard of care that was relevant to Aubree's death. Defs.' Mem. 24. Principally, Necco contends that "due to the complex nature of the child welfare arena, expert testimony is required to establish what the standard of care is with respect to [the] allegations." Defs.' Mem. 27; see Syl. pt. 3, Totten v. Adongay, 175 W. Va. 634, 337

S.E.2d 2 (W. Va. 1985) ("It is the general rule that want of professional skill can be proved only by expert witnesses.").

Necco submits the opinion of its expert, Mr. Crawford, as evidence that it did not violate any applicable industry standard of care. In his expert report, Mr. Crawford states several opinions including:

3. NECCO staff present as highly professional, educated/degreed and appropriately credentialed within agency and industry recognized standards, and adhere to best practices in serving children and families.
4. The pre-service training provided for prospective foster parents is grounded in the PRIDE model, which is nationally recognized as a sound model and curriculum.
5. The additional pre-service training provided by NECCO is also grounded in best practice and comparably meets the standards that many other agencies honor. In short, there was nothing heard or seen that indicated any of the training provided was inappropriate or anything short of best practice in the child welfare industry.
6. The Walls family was properly trained and licensed according to licensing and accrediting bodies.
7. It is not understood why the foster parent, Ms. Walls, placed a rolled up blanket in the infant's crib, as this was specifically addressed in training as inappropriate and a safety hazard. Placing anything in the infant's crib would have been contrary to the training and instructions provided to the foster parents.
8. While the death of this infant was a horrible tragedy, there is nothing to indicate that NECCO was negligent or acted in any manner other than appropriate in the training, preparation, and licensing of this foster family to safely care for the child.

Crawford Report.

Plaintiffs made no response to Necco's argument that it be granted summary judgment as to Count II. Defs.' Reply 10; see generally, Pls.' Resp. Defs.' Mot. The failure to respond to arguments raised in a motion for summary judgment can indicate that the non-moving party concedes the point or abandons the claim. Feldman v. Law Enforcement Assocs. Corp, 955 F. Supp. 2d 528, 536 (E.D. N.C. 2013) (cataloguing cases); Casto v. Branch Banking & Trust Co., 3:16-cv-5848, 2018 U.S. Dist. LEXIS 148, *23 (S.D. W. Va. Jan. 2, 2018). Because of plaintiffs' failure to respond as well as the uncontroverted evidence produced by defendants' expert, Mr. Crawford, defendant's motion for summary judgment as to Count II is granted.

### 4. Res Ipsa Loquitur

Count III of the amended complaint again asserts vicarious liability against Necco for the negligence of its foster parents, as demonstrated res ipsa loquitur, rather than by specific negligence. Am. Compl. ¶¶ 24-28. Plaintiffs allege, "[d]eath does not ordinarily occur to infants safely and reasonably put, placed or positioned in a crib to sleep," and that "Necco, its agents servants or employees negligently put, placed or positioned Aubree Ingersoll, a deceased infant, in a

crib to sleep which caused her death." Id. at ¶¶ 25, 27.
Because Necco may not be held vicariously liable for any alleged
negligence of Ms. Walls, defendants are properly granted summary
judgment as to Count III.

### 5. Punitive Damages

Necco seeks summary judgment on the issue of punitive
damages only to the extent that it receives summary judgment as
to the remainder of plaintiffs' substantive claims. Defs.' Mem.
31-32. Necco correctly asserts that West Virginia law does not
recognize an independent cause of action for punitive damages,
as such damages are a form of relief. See Miller v. Carelink
Health Plans Inc., 82 F. Supp. 2d 574, 579 n. 6 (S.D. W. Va.
2000). Because no substantive claim remains against Necco,
plaintiffs cannot maintain their claim for punitive damages and
Necco should be granted summary judgment as to Count IV.

## IV. Conclusion

In accordance with the foregoing discussion it is ORDERED the defendants' motion for summary judgment be, and it hereby is, granted.  The plaintiffs' motion for summary judgment is denied.

The Clerk is requested to transmit this order to all counsel of record and any unrepresented parties.

DATED:  July 25, 2018

John T. Copenhaver, Jr.
United States District Judge